UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

GRACE ANGELO,
on behalf of the NCLC 401(k) Plan, herself,
and all others similarly situated,

      **Plaintiff,**

v.

NCL CORPORATION LTD, and
NCL (BAHAMAS) LTD., A BERMUDA
COMPANY,

      **Defendants.**

_____/

## CLASS ACTION COMPLAINT

On behalf of the NCLC 401(k) Plan ("Plan"), Named Plaintiff Grace Angelo, ("Plaintiff"), files this Class Action Complaint against NCL Corporation LTD, ("NCL Corp." or the "Company"), and the Plan's administrator, NCL (BAHAMAS) LTD., a Bermuda Company ("NCL Bahamas") (collectively "NCL" or "Defendants"), for breaching their fiduciary duties in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109 and 1132, against Defendants, the Plan's fiduciaries, during the Class Period defined below, for breaches of their fiduciary duties.

2.    Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment

Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

3.      In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.      Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the

value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

6.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

7.     The Named Plaintiff is a Plan participant.  As of December 31, 2020, the Plan had $218,255,089 in assets and 2,357 participants with account balances as of the end of the plan year. Instead of leveraging the Plan's tremendous bargaining power to benefit participants and beneficiaries, Defendants chose poorly performing investments, inappropriate, high-cost mutual fund share classes, and caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services.

8.     Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of their account currently, or as of the time her accounts was distributed, and what her accounts is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

9.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

10.     For example, Defendants failed to adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring investment management fees for the Plan's investments, resulting in several funds during the Class Period being more expensive than comparable funds found in similarly sized plans.  .

11.     To the extent that Defendants made any attempt to reduce the Plan's expenses or to prudently monitor and review the Plan's investment options, Defendants employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that each investment option that was offered in the Plan was prudent.

12.     Defendants' mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendants' actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

13.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

14.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## THE PLAN

15.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

16.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

17.     More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

18.     Eligible current and former employees of NCL are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former NCL employees.  The

ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plan by Defendants.

19.     In theory, Defendants determine the appropriateness of the Plan's investment offerings, monitors investment performance, and reviews total plan and fund costs each year.

## THE PARTIES

### *Plaintiff & Standing*

20.     Named Plaintiff Grace Angelo is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

21.     In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches.

22.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

23.     Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

24.     To the extent the Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.

25.     To establish standing, the Plaintiff need only show a constitutionally adequate injury flowing from those decisions or failures. The Plaintiff alleges such an injury for each claim.

26.     More specifically, the Plaintiff has standing because the challenged conduct, including Defendants' actions resulting in Plaintiff and the class members paying excessive recordkeeping and administrative fees, affected all Plan participants in the same way.

27.     For example, the Named Plaintiff's individual accounts in the Plan suffered losses because each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

28.     Not only that, the Named Plaintiff and all participants in the Plan suffered financial harm as a result of the imprudent options in the Plan because Defendants' inclusion of those imprudent options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options and payment of excessive recordkeeping fees.

29.     Additionally, the Plaintiff has standing as to Defendants' imprudent selection and retention of the poor-performing, expensive, and imprudent funds identified herein, because the Plaintiff invested in at least one of the funds. Thus, the Named Plaintiff and each putative class member suffered a concrete injury traceable to Defendants' imprudent actions.

30.     Moreover, the Plaintiff's individual accounts in the Plan were harmed because they invested in investment options that would have been removed from the Plan had Defendants discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings.

31.     As a result of Defendants' actions, the Plaintiff and class members are entitled to restitution in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

### *Defendants*

32.     Defendant NCL (BAHAMAS) LTD., a Bermuda Company is the Plan sponsor and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

33.     Defendant NCL Corporation LTD, is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

### *Additional Information on the Plan*

34.     The Plan, established January 1, 1989, is a defined contribution and profit-sharing 401(k) plan.

35.     The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA).

36.     Prudential Retirement Insurance and Annuity Company is currently the Plan's recordkeeper.

37.     The Plan's assets are held by Prudential Bank & Trust FSB and participant accounts are maintained by Prudential Bank & Trust FSB.

38.     NCL employees can participate in the Plan after completing three months of employment.

39.     Participants may contribute, subject to certain limitations, up to a maximum of 100% of pretax annual compensation. Each individual's participant contributions were limited to $19,500 in 2020. An additional catch-up contribution up to $6,500 was allowed for employees aged 50 and over.

40.     From January 1, 2020 through March 31, 2020, the Defendant NCL Bahamas contributed an amount equal to 100% of the participants' eligible contributions of the first 3% and 50% of the participants' eligible contributions greater than 3% up to 10%. On April 1, 2020, the Defendant NCL Bahamas amended the plan document to make the employer match contributions discretionary.

41.     In addition, Defendant NCL Bahamas was able to make discretionary supplemental contributions to the Plan, which would be allocated to each eligible participant on a pro-rata basis based on the compensation of the participant to the total compensation of all participants. For the year ended December 31, 2020, Defendant NCL Bahamas did not elect to make discretionary matching or supplemental contributions.

## _Exhaustion of Administrative Remedies is Complete_

42.     On July 19, 2022, Plaintiff sent an Administrative Exhaustion Demand Letter to the Plan Administrator.  The Administrative Exhaustion Demand Letter set forth Plaintiff's claims and included a request for relief on her own behalf, and on behalf of the entire putative class.

43.     In response, by emailed letter dated August 25, 2022, Counsel for the Defendant confirmed stated that Plaintiff's administrative claim was forwarded to the Retirement Plans Investment Committee for consideration and an appropriate response in accordance with the Plan's administrative claims procedure. To date, the Retirement Plans Investment Committee has not provided any response.  Thus, Plaintiff has exhausted her administrative remedies, those of the putative class members, and the Plan as a whole.  Further efforts to exhaust administrative remedies would, thus, be futile.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[1]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 4, 2016, and the present (the "Class Period").

45.     The members of the Class are so numerous that joinder of all members is impractical. According to the 2020 Form 5500 filed with the U.S. Department of Labor, there were 2,357 participants with account balances as of the end of the plan year as of December 31, 2020.

46.     Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries because of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members

---

[1] Plaintiff reserves the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

47.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether Defendants failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of relief.

48.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

49.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would

be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

50.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

51.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

52.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

53.     As described above, Defendants were (and still are) fiduciaries of the Plan because:

      A.     they were so named; and/or

      B.     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

C.   they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

D.   they had discretionary authority or discretionary responsibility in the administration of the Plan.

54.   As fiduciaries, Defendants were/are required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

55.   The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

56.   "Thus, in deciding whether and to what extent to invest in a particular investment, *a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income*. A decision to make an investment may not be influenced by non-economic factors unless the investment, *when judged solely on the basis of its economic value to the plan*, would be equal or superior to alternative investments available to the plan." *U.S. Dep't of Labor ERISA Adv. Op.* 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

57.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

58.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist in a plan, which is "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

59.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

60.     During the Class Period, Defendants did not act prudently or in the best interests of the Plan's participants. Investment options chosen for a plan should not favor the fund provider over the plan's participants. Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many investment options that were more expensive than necessary and otherwise were not justified based on their economic value to the Plan.

61.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for each of the Plan's investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate the lowest expense ratio available for certain investment options maintained and/or added to the Plan during the Class Period. Defendants also caused the Plan and its participants to pay excessive administration fees and excessive compensation to service providers.

62.     As set forth in detail below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are, therefore, liable for their breaches under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## **SPECIFIC ALLEGATIONS**

### ***Improper Management of the Plan Cost the Plan's Participants Millions in Savings***

63.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

64.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan … Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

65.    Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

66.    Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[3] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

67.    Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment

---

[2]  Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited June 24, 2022).

[3] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited June 24, 2022).

options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

68.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[4] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

69.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from services like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[5]

70.     Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

---

[4] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited September 4, 2022).
[5] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited September 4, 2022).

### *Defendants Breached Their Fiduciary Duties by Selecting More Expensive Share Classes Instead of Low-Cost Share Classes of the Same Funds*

71.     The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

72.     The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

73.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

74.     During the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

75.     The chart below contains a non-exhaustive illustration of expensive share classes offered by the Plan during the Class Period and the available lower-cost share classes for the same funds:

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Oakmark International Fund Investor – OAKIX | 1.05% | Oakmark International R6 – OAZIX | .75% |
| Oakmark Investor Class – OAKMX | .91% | Oakmark Fund R6 – OAZMX | .63% |
| T. Rowe Price Emerging Markets Stock Price – PRMSX | 1.11% | T. Rowe Price Emerging Markets Stock Fund I Class – PRZIX | .97% |
| SIA Target Date Fund 2025 Class 2 | .60% | SIA Target Date Fund 2025 Class 1 | .45% |
| SIA Target Date Fund 2030 Class 2 | .60% | SIA Target Date Fund 2030 Class 1 | .45% |
| SIA Target Date Fund 2035 Class 2 | .60% | SIA Target Date Fund 2035 Class 1 | .45% |
| SIA Target Date Fund 2040 Class 2 | .60% | SIA Target Date Fund 2040 Class 1 | .45% |
| SIA Target Date Fund 2045 Class 2 | .60% | SIA Target Date Fund 2045 Class 1 | .45% |
| SIA Target Date Fund 2050 Class 2 | .60% | SIA Target Date Fund 2050 Class 1 | .45% |
| SIA Target Date Fund 2055 Class 2 | .61% | SIA Target Date Fund 2025 Class 1 | .46% |
| SIA Target Date Fund 2060 Class 2 | .61% | SIA Target Date Fund 2055 Class 1 | .46% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Vanguard Mid-Cap Index Fund Admiral– VIMAX | **.050%** | Vanguard Mid-Cap Index Fund Institutional – VMCIX | **.040%** |

76.     As the table above illustrates, throughout the Class Period Defendants should have known of the existence and availability of lower-cost share classes of ***identical funds*** and should have promptly transferred the Plan's investments in such funds to the prudent share classes. However, Defendants failed to do so in a prudent manner.

77.     Qualifying for lower share classes sometimes requires a minimum investment in individual funds. However, these minimums are waived for retirement plans like the Plan here. In any event, in most instances the Plan qualified for the lower cost share classes but is paying for higher cost share classes. Plan assets are being needlessly wasted and retirement savings frittered away. This is a classic breach of ERISA's fiduciary duty of prudence.

78.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Defendants did not transfer Plan holdings in any of these funds from higher-priced share classes into the lowest-cost institutional share classes, in breach of their fiduciary duties.

79.     There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the ***exact same investment***. This is akin to causing Plan participants to pay $3 million for an investment when the ***same investment*** is available for $1 million. The entire purpose of ERISA's prudence standards is to avoid this type of imprudence.

The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

### *Defendants Failed to Monitor or Control the*
### *Plan's Recordkeeping and Administrative Expenses*

80.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

81.     Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans can customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

82.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

83.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

84.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

85.     Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiff is not making a claim against Defendants merely because they used revenue sharing to pay recordkeeping fees.

86.     However, when revenue sharing is left unchecked, it can be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees."[6]

87.     Because revenue sharing payments are asset based, they bear no relation to a reasonable recordkeeping fee and can provide excessive compensation. Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or investments in mutual funds in the Plan. As the assets in the Plan increase, so too increases the recordkeeping fees that Capital Research pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work

---

[6]  Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited September 4, 2022).

provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

88.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

89.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

90.     Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent

fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

91.     Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

92.     Defendants failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps.

93.     More specifically, Prudential Retirement Insurance and Annuity Company has been the Plan's recordkeepers during the entirety of the Class Period.

94.     Upon information and belief Defendants have failed to undertake an RFP during the class period. If Defendants had undertaken an RFP to compare Prudential Retirement Insurance and Annuity Company's costs with those of others in the marketplace, Defendants would have recognized that Prudential Retirement Insurance and Annuity Company's compensation for recordkeeping services during the Class Period has been (and remains) unreasonable and excessive.

95.     From 2016 to 2020 the direct annual recordkeeping per participant compensation that Prudential Retirement Insurance and Annuity Company received from Plan participants was as follows:

| Year | Direct Recordkeeping Compensation |
|------|-----------------------------------|
| 2016 | $43.10 |
| 2017 | $46.18 |
| 2018 | $22.04 |
| 2019 | $80.41 |
| 2020 | $75.68 |

96.     By comparison to other plans, the recordkeeping fees are excessive and unreasonably high. For instance, the 401k Averages Book (20th ed. 2020), examined recordkeeping fees for plans with less $200 million in assets (*i.e.*, substantially smaller than the Plan), and demonstrated that as plans increase in size the costs of recordkeeping generally decrease on a per participant basis—a classic example of economies of scale. But here the opposite is happening. As Plan assets increase so are recordkeeping fees.

97.     A plan with 200 participants and $20 million in assets, the average recordkeeping and administration cost (through direct compensation) is $12 per participant. 401k Averages Book at 95. A plan with 2,000 participants and $200 million in assets, the average recordkeeping and administration cost (through direct compensation) is $5 per participant. *Id*. at 108. Defendants caused Plan participants to pay excessive fees.

98.     Moreover, Prudential Retirement Insurance and Annuity Company did not receive only the direct compensation set forth above—it received far more compensation for recordkeeping and other administrative services through revenue sharing payments. Such revenue

sharing payments are particularly problematic because they are asset-based, and they usually bear no relation to a reasonable recordkeeping fee. Rather, in large plans, like this one, revenue sharing often results in excessive compensation, especially like here, when high-priced funds are included as plan investment options.

99.    As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

100.    Another problem is that "revenue sharing is not equivalent among all funds; some funds pay no revenue sharing and others pay different revenue-sharing rates. The issue then arises that it may not be fair for some participants to pay a higher expense ratio because revenue sharing is built in. Another concern is that plan participants who invest in more expensive, revenue-sharing funds are bearing a disproportionate amount of the plan's administrative costs compared with their coworkers who have chosen funds without revenue sharing." Jennifer DeLong, *Coming to Grips with Excess Revenue Sharing*, Context, The AllianceBernstein Blog on Investing (June 2014).[7] Thus, prior to the Class Period, AllianceBernstein noted, "the prevalence of revenue sharing is decreasing as more plans rethink their strategies for making plan fees more transparent." *Id.*

---

[7]  Available at: https://blog.alliancebernstein.com/post/en/2014/06/coming-to-grips-with-excess-revenue-sharing (last visited September 4, 2022).

101.     As recognized prior to the Class Period, the best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan.

102.     The Plan's total expenses for recordkeeping reveals the true extent of Defendants' fiduciary breaches. The total amount of recordkeeping fees (both through direct and indirect payments) currently is at least $150 per participant annually (or more), when a reasonable fee ought to be no more than $25 per participant annually.

103.     As noted above, some plans pay recordkeepers fees in addition to direct compensation in the form of revenue sharing. Here, the Plan paid Prudential Retirement Insurance and Annuity Company a fortune in direct and indirect compensation for recordkeeping services throughout the Class Period.

104.     The recordkeeping fees are far greater than recognized reasonable rates for a plan with more than $200 million in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to superior to the typical services that would have been provided to the Plan by Prudential Retirement Insurance and Annuity Company. Prudential Retirement Insurance and Annuity Company performs task for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management (computing, tabulating, data processing, etc.)

105.     The services that Prudential Retirement Insurance and Annuity Company provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees

being paid to the recordkeepers and taken corrective action.   Defendants' failure to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

106.    Looking at recordkeeping costs for other plans of a similar size as of 2019 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.   The chart below analyzes a few well managed plans having tens of thousands of participants with billions of dollars in assets under management, like the Plan:

| Name of Plan | Total Number of Participants | Dollar Value of Plan Assets | Total Reported Recordkeeping and Administrative Service Costs | Recordkeeping and Administrative Service Costs on a Per-Participant Basis[8] |
|---|---|---|---|---|
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | $27 |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 46,943 | $3,793,834,091 | $1,526,401 | $33 |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | $30 |

---

[8] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. See Instructions for Form 5500 (2019) at pg. 27 (defining each service code), available at https://www .dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2019-instructions.pdf.

107.    Thus, Defendants should have been able to negotiate a recordkeeping cost anywhere from $21 per participant to $33 from the beginning of the Class Period to the present. Defendants failed to do so (except for in 2018).

108.    In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Defendants could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.  Defendants failed to do so and, as a result, violated their fiduciary duties under ERISA.

109.    Finally, as stated above, the Plan has nearly $220 million of assets. This is Plan participant money. Upon information and belief, Defendants agreed that anytime Plan participants deposit or withdraw money from their individual accounts, that the money will first pass through a Prudential clearing account.

110.    Upon information and belief, Defendants agreed Prudential could keep all of the interest earned on Plan participant accounts while participant money is in Prudential's clearing account. This is a form of indirect compensation that Prudential receives as the recordkeeper for the Plan. However, Prudential has not tracked, monitored, or negotiated the amount of compensation Prudential receives from income it earns on Participant money. Defendants breached their fiduciary duty of prudence by allowing Prudential to receive compensation from Plan participants without even knowing the amount of compensation Prudential collects from interest on participant money.

**FIRST CLAIM FOR RELIEF**
***Breaches of Fiduciary Duties of Prudence***

111.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

112.    As a fiduciary of the Plan, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

113.    Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants and consistent with the ISP. Instead, Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

114.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

115.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### *Failure to Adequately Monitor Other Fiduciaries and Service Providers*

116.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

117.    Defendants are the named fiduciary with the overall responsibility for the control, management, and administration of the Plan, in accordance with 29 U.S.C. §1102(a).  Defendants are the Plan Administrator of the Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

118.    Given that Defendants had the overall responsibility for the oversight of the Plan, Defendants had a fiduciary responsibility to monitor the performance of the other fiduciaries and service providers, including those delegated fiduciary responsibility to administer and manage Plan assets.

119.    A monitoring fiduciary must ensure that its monitored fiduciaries and service providers are performing their obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

120.    Defendants breached their fiduciary monitoring duties by, among other things:

   A. Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

   B. Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

   C. Failing to ensure that the monitored fiduciaries and service providers had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

   D. Failing to ensure that the monitored fiduciaries and service providers considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

   E. Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

121.    Had Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiff, and the other Class Members lost millions of dollars of retirement savings.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

1.    Find and declare that the Defendants have breached their fiduciary duties as described above;

2.    Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.    Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.    Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

5.    Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.    Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.    Reform the Plan to include only prudent investments;

8.    Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

9.    Certify the Class, appoint the Plaintiff as class representatives, and appoint their counsel as Class Counsel;

10.    Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

11.    Order the payment of interest to the extent it is allowed by law; and

12.    Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 16th day of September 2022.

Respectfully submitted,

**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA, P.A.**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: **0285020**
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com