**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.:1:22-cv-22962-SINGHAL-MCALILEY**

**GRACE ANGELO,**
**On behalf of the NCLC 401(k)**
**Plan, herself, and all others similarly**
**situated,**

     **Plaintiff,**

**v.**

**NCL CORPORATION LTD., and**
**NCL (BAHAMAS) LTD., a**
**BERMUDA COMPANY,**

     **Defendants.**

_____/

**DEFENDANTS' MOTION TO DISMISS**
**<u>AND MEMORANDUM IN SUPPORT</u>**

W. Bard Brockman, Esq.
Florida Bar # 0868817
**BRYAN CAVE LEIGHTON PAISNER LLP**
200 S. Biscayne Boulevard
Suite 400
Miami, Florida  33131
Telephone: (786) 322-7500
Email:  bard.brockman@bclplaw.com

Michael P. Carey, Esq.
Georgia Bar # 109364 *(pro hac vice pending)*
Ann Wrege Ferebee, Esq.
Georgia Bar # 431941 *(pro hac vice pending)*
**BRYAN CAVE LEIGHTON PAISNER LLP**
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email:  michael.carey@bclplaw.com
Email:  ann.ferebee@bclplaw.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................ii

I.  INTRODUCTION............................................................................................................ 1

II.  BACKGROUND .............................................................................................................. 4

    A.  NCL And The Plan ............................................................................................... 4

    B.  Plaintiff's Account ............................................................................................... 6

    C.  Plaintiff's Complaint ........................................................................................... 6

    D.  The Plan's Administrative Procedures ............................................................... 7

III.  ARGUMENT.................................................................................................................... 8

    A.  Governing Legal Standards ................................................................................. 8

    B.  The Complaint Fails To State A Claim Against NCL ....................................... 8

        1.  The Complaint's Allegations Regarding "Excessive Recordkeeping Fees" Fail To State A Prudence Claim. ....................................................... 9

        2.  The Complaint's Allegations Regarding "Inappropriate" Share Classes Fail To State A Prudence Claim........................................................... 12

        3.  The Complaint Fails To State A Duty Of Loyalty Claim.............................. 15

        4.  Plaintiff's Derivative "Failure to Monitor" Claim Must Also Be Dismissed. 17

    C.  The Complaint Fails To State A Claim Against NCL Corporation Ltd.........17

    D.  Facts Plaintiff Learned In The Administrative Proceeding Further Demonstrate The Implausibility Of Her Claims............................................. 18

IV.  CONCLUSION ............................................................................................................. 20

CERTIFICATE OF SERVICE ............................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Albert v. Oshkosh Corp.*
  47 F.4th 570 (7th Cir. 2022)......................................................................... 2, 9, 11, 12

*Anderson v. Coca-Cola Bottlers' Assoc.*,
  2022 WL 951218 (D. Kan. Mar. 30, 2022)........................................................ 10, 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 4, 8, 18

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 4, 8, 18

*Bickley v. Caremark RX, Inc.*,
  461 F.3d 1325 (11th Cir. 2006)................................................................................. 18

*Brooks v. Blue Cross & Shield of Fla., Inc.*,
  116 F.3d 1364 (11th Cir. 1997)................................................................................... 4

*Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols. Inc.*,
  658 F. App'x. 966 (11th Cir. 2016)........................................................................... 17

*Chudasama v. Mazda Motor Corp.*,
  123 F.3d 1353 (11th Cir. 1997)................................................................................. 20

*Counts v. Am Gen. Life & Accident Ins. Co.*,
  111 F.3d 105 (11th Cir. 1997).................................................................................... 18

*Divane v. Northwestern Univ.*,
  953 F.3d 980 (7th Cir. 2020)...................................................................................... 12

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ..................................................................................................... 8

*Fleming v. Rollins, Inc.*,
  2020 WL 7693147 (N.D. Ga. Nov. 23, 2020).......................................................... 18

*Foster v. Adams & Assocs., Inc.*,
  2020 WL 3639648 (N.D. Cal. Jul. 6, 2020).............................................................. 17

*Fritton v. Taylor Corp.*,
  2022 WL 17584416 (D. Minn. Dec. 12, 2022)................................................... 10, 12

*Garland v. Snap-On Inc. Ret. Plan*,
  2021 WL 1192991 (N.D. Ga. Mar. 8, 2021)............................................................. 19

*Guyes v. Nestle USA, Inc.*,
  2022 WL 18106384 (E.D. Wisc. Nov. 21, 2022)................................................ 11, 16

*Guyes v. Nestle USA, Inc.*,
2023 WL 22629 (E.D. Wisc. Jan. 3, 2023) ................................................................ 11

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009)..................................................................................... 14

*Hughes v. Northwestern Univ.*,
142 S. Ct. 737 (2022) ........................................................................................... 12, 15

*In re ING Groep, N.V. ERISA Litig.*,
749 F. Supp. 2d 1338 (N.D. Ga. 2010) ....................................................................... 4

*In re McKesson HBOC, Inc.*,
391 F. Supp. 2d 812 (N.D. Cal. 2005) ...................................................................... 16

*Kaylor v. Fields*,
661 F.2d 1177 (8th Cir. 1981)................................................................................... 20

*Krutchen v. Ricoh USA*,
2022 WL 16950264 (E.D. Pa. Nov. 15, 2022)...................................................... 10, 11

*Leimkuehler v. American United Life Ins. Co.*,
713 F.3d 905 (7th Cir. 2013)..................................................................................... 14

*Marks v. Trader Joe's Co.*,
2020 WL 2504333 (C.D. Cal. Apr. 24, 2020)........................................................... 14

*Mason v. Continental Grp., Inc.*,
763 F.2d 1219 (11th Cir. 1985).................................................................................. 19

*Mator v. Wesco Distr., Inc.*,
2022 WL 3566108 (E.D. Pa. Aug. 18, 2022)......................................................... 9, 11

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022).............................................................................. 2, 10, 11

*Moitoso v. FMR LLC*,
451 F. Supp. 3d 189 (D. Mass. 2020) ......................................................................... 6

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*,
712 F.3d 705 (2d Cir. 2013)......................................................................................... 9

*Pledger v. Reliance Trust Co.*,
2019 WL 10886802 (N.D. Ga. Mar. 28, 2019).......................................................... 16

*Riley v. Olin Corp.*,
2022 WL 2208953 (E.D. Mo. June 21, 2022)................................................. 10, 12, 15

*Rinehart v. Lehman Bros. Hldgs. Inc.*,
  817 F.3d 56 (2d Cir. 2016) ................................................................................................. 17

*Santiago v. Univ. of Miami*,
  2021 WL 1173164 (S.D. Fla. Mar. 1, 2021) ................................................................. 16, 17

*Smith v. CommonSpirit Health*,
  2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ..................................................................... 16

*Smith v. CommonSpirit Health*,
  37 F.4th 1160 (6th Cir. 2022) ......................................................................................... 2, 9

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) ........................................................................................... 9

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ........................................................................................... 13

*Williamson v. Travelport, LP*,
  953 F.3d 1278 (11th Cir. 2020) ....................................................................................... 19

*Young v. General Motors Inv. Mgmt. Corp.,*
  325 F. App'x. 31 (2d Cir. 2009) ......................................................................................... 9

## Statutes

29 U.S.C. § 1002(21)(A) ...................................................................................................... 17
29 U.S.C. § 1104(a) .............................................................................................................. 6
29 U.S.C. § 1104(a)(1)(A) .................................................................................................... 16
29 U.S.C. § 1104(a)(1)(B) ...................................................................................................... 9

## Other Authorities

Chirinos, Tulio D., *Fee and Investment Litigation 2015-2020*, 34 Benefits L.J. 1, 2 (2021) ......... 1

## Rules

Fed. R. Civ. P. 12(b)(6) ..................................................................................................... 1, 8

NOW COME Defendants NCL Corporation Ltd. and NCL (Bahamas) Ltd. and, pursuant to Fed. R. Civ. P. 12(b)(6), move to dismiss Plaintiff's Complaint in its entirety with prejudice.

## I.      INTRODUCTION

This putative class action concerns the NCLC 401(k) Plan ("Plan"), a "defined contribution" retirement plan governed by ERISA.  The Plan is designed to permit its participants to save for retirement on a tax-advantaged basis.  NCL (Bahamas) Ltd. ("NCL") is designated as the Plan Administrator, and is alleged to be ultimately responsible for ensuring that the Plan is administered prudently for the benefit of its participants.  To carry out these duties, NCL appointed a committee of employees (the "Committee") who select the Plan's investment options and contract with outside vendors as necessary to perform administrative tasks.

Plaintiff's Class Action Complaint ("Complaint" or "Compl.") alleges that Defendants, NCL and its parent company NCL Corporation Ltd.,[1] caused the Plan to invest in "inappropriate, high-cost mutual fund share classes" and "to pay unreasonable and excessive fees for recordkeeping and other administrative services," and thus breached their fiduciary duties to the Plan under ERISA.  Compl. ¶ 7.  These types of claims have become commonplace.  *See* Chirinos, Tulio D., *Fee and Investment Litigation 2015-2020*, 34 Benefits L.J. 1, 2 (2021) (identifying approximately 100 similar ERISA class actions filed in the year 2020 alone).  Many of these lawsuits are premised on vague, cookie cutter allegations regarding the plan's investment lineup and administrative costs.  Plaintiff's Complaint is no different.  Its central allegation is that the Plan paid excessive compensation to its recordkeeper, which is the entity

---

[1]   As argued in Part III.C *infra*, NCL Corporation Ltd. should be dismissed because there are no plausible allegations that it was a Plan fiduciary.  Although the Complaint refers to "Defendants" interchangeably, the references herein to "NCL" are solely meant to refer to NCL (Bahamas) Ltd.

responsible for most of its day-to-day administrative functions. Yet the Complaint fails to specifically allege what services the recordkeeper provided in exchange for the fees paid. And when it attempts to compare those fees to what other plans paid, it likewise fails to allege anything about what services those plans received. Multiple recent appellate decisions have affirmed the dismissal of substantially similar complaints for this very reason. *See Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022); *Albert v. Oshkosh Corp.,* 47 F.4th 570 (7th Cir. 2022); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274 (8th Cir. 2022). As in those cases, Plaintiff's allegations are too speculative to state a claim.

The rest of the Complaint is dependent on the success or failure of its allegation that recordkeeping fees were excessive. Plaintiff alleges that twelve of the Plan's funds were "inappropriate" because cheaper share classes of the same fund were available. *See* Compl. ¶ 75. But other allegations in the Complaint supply the reason why these share classes were selected. The Plan uses revenue sharing to pay for administrative services, including recordkeeping. Under a revenue sharing model, the recordkeeper is paid indirectly through a portion of the fund's expenses, rather than directly by the Plan or its participants. Fund share classes that pay revenue sharing are naturally more expensive than classes that do not. The Complaint admits that revenue sharing is not imprudent *per se* and that Plaintiff has not brought this action "merely" because the Plan used revenue sharing. *Id.* ¶ 85. In an effort to craft some sort of claim that is not simply a broadside attack on revenue sharing, Plaintiff then speculates that revenue sharing *could* become imprudent if it causes recordkeeping fees to become excessive. *Id.* ¶ 86. Since the Complaint fails to plausibly allege that recordkeeping fees actually were excessive, its speculation as to potential dangers is irrelevant and fails to state a claim.

2

Plaintiff also alleges that a prudent fiduciary would have eschewed revenue sharing in favor of an annual flat fee of anywhere between $21 and $33 per participant to cover recordkeeping costs. *Id.* ¶ 107.  Neither ERISA nor the Plan documents require this, and the claim is legally without merit.  But even if these allegations made out a plausible claim, the facts show that Plaintiff (like all Plan participants) was charged *no direct fee* for recordkeeping (because the Plan used revenue sharing), and the total amount that she could possibly have paid in recordkeeping costs through her investments was *less than $2*.  She would have been considerably worse off if she was charged a flat fee in the range she proposes.  That is a feature of revenue sharing, not a bug—it benefits holders of small accounts like Plaintiff.

Plaintiff cannot avail herself of the usual response that she had no access to internal Plan information relevant to her claims.  To be sure, a rank-and-file plan participant is not expected to know the details of how plans are administered prior to drafting a complaint.  That is why courts have allowed plan participants to plead a claim through circumstantial facts gathered through review of publicly available information, as Plaintiff has attempted to do.  But in this case, Plaintiff had additional tools that she did not use.  The Plan has an administrative review procedure, and Eleventh Circuit precedent requires exhaustion of those procedures prior to filing suit.  The exhaustion requirement is designed to streamline litigation by reducing frivolous claims and creating a factual record.  Here, Plaintiff filed an administrative claim prior to filing suit, but then preemptively filed this action before the administrative procedure had run its course.  Had she properly exhausted her administrative remedies, Plaintiff would have learned that key allegations in the Complaint are simply false.  For instance, the Complaint alleges "upon information and belief" that NCL never solicited competitive bids for recordkeeper services.  Compl. ¶ 94.  But Plaintiff learned in the administrative proceeding that NCL, in fact, conducted

a request for proposal ("RFP") for recordkeeper services in 2018, and chose a competitor over the incumbent. In other words, NCL did **exactly** what Plaintiff alleges it should have done. In addition, the administrative procedure confirmed what was already clear from Plaintiff's account history—that she would have been worse off with the flat fee that she alleges NCL should have imposed. To grant this motion, the Court need not consider any portion of the administrative record (because the Complaint's allegations fail to state a claim under *Twombly* and *Iqbal*), but these problems further confirm the Complaint's utter lack of plausibility.

## II.   BACKGROUND

### A.   NCL And The Plan

The Plan is a "defined contribution" 401(k) plan in which eligible employees hold individual, self-directed accounts. Compl. ¶ 17; Declaration of Michael Carey ("Decl."), attached hereto as Exhibit "A," at Ex. 9.[2] As of December 31, 2021, the Plan had over 3,300 participants and over $250 million in assets. Decl. Ex. 17 Line 6(f) and Sch. H Line 1(f). In a defined contribution plan, participants contribute a portion of their wages into individual accounts (which also receive employer contributions), and decide how to invest those contributions from a pre-determined menu of investment options. Compl. ¶¶ 18-19.

NCL, a Miami-based operator of passenger cruise ships, is the Plan's sponsor and is alleged to be a named fiduciary of the Plan. *Id.* ¶ 32. NCL delegated to the Committee the

---

[2]   The exhibits to the motion are properly considered on a motion to dismiss because they are either referenced in the Complaint or central to its allegations. *See Brooks v. Blue Cross & Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Exhibits 9-18 are core plan documents that courts regularly consider in ERISA cases. *See, e.g., In re ING Groep, N.V. ERISA Litig.*, 749 F. Supp. 2d 1338, 1344 (N.D. Ga. 2010). Exhibits 9-11 and 18-33 are relevant portions of the administrative record. The Court may consider the administrative record on a motion to dismiss, but does not need to do so in order to grant the motion to dismiss. See Part III.D *infra*.

duties of the Plan Administrator.  Decl. Ex. 19.  The Committee's duties include constructing and monitoring the Plan's investment lineup.  *Id.*  In addition, the Committee is responsible for monitoring service providers who perform necessary administrative tasks, including the Plan's recordkeeper.  *Id.*  "Recordkeeper" is the shorthand term for the entity that maintains participant-level data, processes trades and performs other necessary participant-level functions.  Compl. ¶ 80.  Since 2019, the Plan's recordkeeper has been Prudential.  Decl. Exs. 14-17.[3]  Prudential's recordkeeping fees are considered to be expenses of the Plan.  *See id*.  They are not paid directly by the Plan, however.  Instead, the Plan uses revenue sharing to pay for administrative expenses, including recordkeeping fees.  Compl. ¶ 85; Decl. Exs. 14-17 (indicating that Prudential receives indirect compensation).  When a plan uses revenue sharing, the recordkeeper is compensated by the mutual fund sponsor rather than by the plan directly.  Compl. ¶ 84.  Specifically, the mutual fund sponsor pays a portion of the fund's "expense ratio" to the recordkeeper to cover costs that the sponsor would otherwise need to provide on its own.  *Id.*[4]  Since the Plan does not pay recordkeeping fees directly, it does not need to allocate such expenses to the participants through a direct fee.  Instead, participants pay for recordkeeping costs by investing in revenue sharing funds.  Regardless of whether the Plan were to use revenue sharing or not, its participants would be responsible for the payment of administrative costs such as recordkeeping fees.  See Decl. Ex.

---

[3]   The Complaint alleges, incorrectly, that Prudential was the recordkeeper throughout the putative class period.  Compl. ¶ 93.  In fact, the Plan's recordkeeper between 2016 and 2018 was Great-West Life & Annuity Insurance Co. d/b/a Empower.  Decl. Exs. 12-13.  Although it is not relevant to Plaintiff's claims, Empower subsequently acquired Prudential's recordkeeping business in April, 2022.  Effective February, 2023, Fidelity will be the Plan's recordkeeper.

[4]   A fund's "expense ratio" is the percentage by which the fund's assets are reduced by its expenses.  For a hypothetical fund with a 1% expense ratio, investors' returns are reduced $10 for each $1,000 invested.

9 § 9.05(d) (authorizing the plan administrator to allocate Plan expenses by any method that does not violate ERISA or discriminate in favor of highly compensated employees).

### B.     Plaintiff's Account

Plaintiff has participated in the Plan since only the first quarter of 2022.  Decl. Ex. 31.  At all relevant times, her entire account was invested in the SIA Target Date 2050, a collective investment trust that invests in the T. Rowe Price Retirement 2050 Fund.[5]  Plaintiff's account statements show that her account has not been assessed any direct fees of any kind since inception.  Decl. Exs. 31-33.  Her SIA Target Date 2050 fund, however, pays a 15 basis point service fee to the Plan's recordkeeper, according to the fund's publicly available fact sheet.[6] Decl. Ex. 35.  This means that for every $1,000 invested in that fund, $1.50 is paid to the Plan's recordkeeper annually through revenue sharing.  From the inception of Plaintiff's account through September 16, 2022, the date of her Complaint, Plaintiff consistently maintained an account balance below $1,050.  Decl. Exs. 31-33.  Accordingly, the total amount that she had paid in revenue sharing at the time she filed the Complaint could not have been more than $2.

### C.     Plaintiff's Complaint

Plaintiff alleges that NCL caused the Plan to be invested in "inappropriate, high-cost mutual fund share classes" and "to pay unreasonable and excessive fees for recordkeeping and other administrative services."  Compl. ¶ 7.  These allegations form the basis of both of the Complaint's two counts.  Count I alleges that the Defendants breached their fiduciary duty of prudence under ERISA § 404(a), 29 U.S.C. § 1104(a).  *Id.* ¶¶ 111-115.  Count II alleges that the

---

[5]   Collective investment trusts are similar to mutual funds, but have different regulatory features and fee structures.  *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 210 n.7 (D. Mass. 2020).

[6]   A basis point is one-tenth of one percent.  In percentage terms, the effect of the revenue sharing payment is to raise the fund's expense ratio by .15%.

Defendants failed to monitor other fiduciaries and service providers and is premised on the same alleged breaches described in Count I.  *Id.* ¶¶ 116-121.

> D.     **The Plan's Administrative Procedures**

The governing Plan document requires the exhaustion of administrative remedies before filing suit.  Decl. Ex. 9 § 11.07.  Under the Plan's administrative procedure, participants must submit a written claim to the Plan Administrator.  *Id.*  The Plan Administrator is then required to rule on the claim within 90 days and notify the participant of its determination in writing, explaining the reasons for any denial.  *Id.*  Plaintiff (through her counsel) submitted a claim letter on July 19, 2022.  Compl. ¶ 42; Decl. Ex. 1.  Prior to the expiration of the review period set forth in the Plan, on September 16, 2022, Plaintiff initiated this action by filing the Complaint.  The Complaint does not explain why Plaintiff filed without exhausting the administrative procedure, or attempt to allege that exhaustion was futile under the circumstances.[7]

Despite Plaintiff's attempt to short-circuit the Plan's administrative procedure, the Committee (acting under its authority as Plan Administrator) reviewed the claim as contemplated in the Plan documents.  The Committee determined that the claim lacked merit and notified Plaintiff of its decision to deny the claim on October 14, 2022.  Decl. Ex. 4.  The Plan makes available a right to appeal adverse claims decisions, which also must be exhausted prior to filing suit.  Plaintiff submitted an appeal on November 7, 2022.  Decl. Ex. 5.  The Committee found the appeal to be without merit and notified Plaintiff of its final decision on December 29, 2022.  Decl. Ex. 8.  During the course of the administrative procedure, NCL produced over 3,800 pages of documents relevant to Plaintiff's claims.  These documents included (1) the Plan's governing

---

[7]     Under the Plan's terms, a claim is deemed exhausted, and the participant's right to file a lawsuit ripens, after the participant is notified of an adverse decision on appeal.  Decl. Ex. 9 § 11.07.

documents and trust agreements; (2) the Plan's fee-related disclosures under ERISA Sections 404(a) and 408(b) for the period in which Prudential served as recordkeeper; (3) a full set of the Committee's minutes dating back to 2016, along with presentations and reports shared with the Committee at those meetings; (4) the Plan's contracts with Prudential; (5) all versions of the Plan's Investment Policy Statement during the class period; (6) documents relating the Plan's recordkeeper RFP's in 2018 and 2022; and (7) Plaintiff's account statements.  Decl. Exs. 2-3 and 6-7.

### III.   ARGUMENT

#### A.   Governing Legal Standards

To withstand dismissal pursuant to Federal Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").  In ERISA breach of fiduciary duty cases, motions to dismiss serve as an "important mechanism for weeding out meritless claims."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  This is because breach of fiduciary duty class actions present an enhanced risk of "meritless, economically burdensome lawsuits" that may discourage employers from offering employee benefit plans in the first place.  *See id*.

#### B.   The Complaint Fails To State A Claim Against NCL

Count I of the Complaint alleges that NCL breached ERISA's fiduciary duty of prudence. Count II is styled as a claim for "failure to monitor" that is derivative of Count I's prudence claim.  Both counts, therefore, turn on whether the Complaint plausibly alleges that NCL failed to exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that

a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  The duty of prudence includes an ongoing duty to monitor the prudence of investment options and administrative expenses.  *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016). Importantly, the prudence requirement "does not give the federal courts a broad license to second-guess the investment decisions of retirement plans."  *Smith*, 37 F. 4th at 1162.  Rather, the test is "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular [decision]."  *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.,* 712 F.3d 705, 716 (2d Cir. 2013).  The Complaint includes no specific allegations regarding NCL's plan administration processes.  In order for Plaintiff state a claim, therefore, she must allege sufficient circumstantial facts to raise a plausible inference that those processes were flawed.  *See id.*

> 1. The Complaint's Allegations Regarding "Excessive Recordkeeping Fees" Fail To State A Prudence Claim.

Plaintiff alleges that NCL acted imprudently by allowing Prudential's compensation to be excessive.  Compl. ¶¶ 80-110.  To prevail on such a theory at the dismissal stage, a plaintiff must allege facts showing "that fees were excessive related to the services rendered."  *Young v. General Motors Inv. Mgmt. Corp.,* 325 Fed. Appx. 31, 33 (2d Cir. 2009); *Smith,* 37 F. 4th at 1169; *Albert*, 47 F. 4th at 580.  The Complaint fails to meet this standard in multiple ways.

First, it lacks any meaningful allegations describing the specific nature or quality of the services Prudential provided to the Plan.  This alone is fatal.  *See id.; Mator v. Wesco Distr., Inc.,* 2022 WL 3566108, at *7 (E.D. Pa. Aug. 18, 2022) ("Plaintiffs have presented nothing beyond conclusory allegations regarding services with no particularity as to the quality of the services that Plan participants received."); *Riley v. Olin Corp.*, 2022 WL 2208953, at *4 (E.D. Mo. June

21, 2022) ("[T]he plaintiff must 'plead that the administrative fees are excessive in relation to the *specific services* the recordkeeper provided to the *specific plan* at issue.'"); *Anderson v. Coca-Cola Bottlers' Assoc.*, 2022 WL 951218, at *11 (D. Kan. Mar. 30, 2022) ("[P]laintiff has not provided any detail concerning the particular services for which [the recordkeeper] received the allegedly unreasonable payments of fees…"); *see also Matousek*, 51 F.4th at 279 (emphasizing the need to identify what the recordkeeper's services were); *Fritton v. Taylor Corp.*, 2022 WL 17584416, at *4 (D. Minn. Dec. 12, 2022).  ("It is necessary to determine what recordkeeping services the Plan offers…").  Rather than allege specific details about services provided, the Complaint pivots in the opposite direction, alleging that all recordkeepers are essentially the same and offer the same services.  Compl. ¶¶ 80-81.  Even if that proposition were accepted as true, it is irrelevant, because what matters is not the range of services offered in the market but rather the specific services that the Plan received.  As the Complaint admits, recordkeeping services are customizable.  *Id.*  "Fiduciaries may select diverse services from bundled offerings or elect additional a la carte services, prioritizing various options differently depending on their plans' unique needs and reasonably choosing to pay more for higher quality services."  *Krutchen v. Ricoh USA*, 2022 WL 16950264, at *3 (E.D. Pa. Nov. 15, 2022). Without knowing what the Plan specifically received, it is impossible to draw the inference that the Plan's fees were excessive.

Second, the Complaint fails to identify an appropriate benchmark in the form of facts establishing what would constitute a prudent recordkeeping fee under the circumstances.  Instead, the Complaint cites industry statistics published in the *401k Averages Book* and compares Prudential's compensation to three other plans' reported recordkeeping fees.  Compl. ¶¶ 96-97, 106.  But there are no specific allegations as to the specific services received by the

three comparator plans or any of the plans surveyed in the *401k Averages Book*.  Without these allegations, Plaintiff is left with a mere "price tag to price tag comparison," which is not enough to state a plausible claim.  *See Mator*, 2022 WL 3566108 at *7; *see also Albert*, 47 F.4th at 580 (affirming dismissal of complaint that identified several comparator plans but failed to allege specific services rendered); *Guyes v. Nestle USA, Inc.*, 2022 WL 18106384, at *4 (E.D. Wisc. Nov. 21, 2022), report and recommendation adopted, 2023 WL 22629 (E.D. Wisc. Jan. 3, 2023) (same); *Krutchen*, 2022 WL 16950264, at *3 (dismissing complaint that "fail[ed] to include any information about the specific services used by Defendant's Plan or the benchmark plans"); *Anderson*, 2022 WL 951218, at *11 (noting "the absence of facts that the other plans received the same services."); *Matousek*, 51 F. 4th at 279 (holding that the *401k Averages Book* is not a meaningful comparator for excessive fee claims).[8]

Third, the Complaint fails to quantify and explain the Plan's recordkeeping fees in terms that are understandable and can form the basis for an apples-to-apples comparison.  It presents a chart purporting to calculate the Plan's recordkeeping expenses on a per-participant basis, despite the fact that participants are not directly charged such a fee.  *See* Compl. ¶ 95.  Plaintiff does not explain how she calculated the numbers in her chart.[9]  Nor is there any explanation as to how the *401(k) Averages Book* or the three comparator plans calculated fees.  *See Fritton*, 2022

---

[8]    Plaintiff's citation to statistics from the *401k Averages Book* is virtually identical to the failed approach in *Matousek*.  *See* 51 F.4th at 280 ("It is almost impossible to tell if these figures provide a meaningful benchmark").

[9]    It appears, from examination of the Plan's publicly filed annual reports, that Plaintiff has taken the line item for the Plan's "total administrative expenses" (Decl. Exs. 14-17 at Schedule H, Line 2i(5)) and divided it by the number of participants with positive account balances at the end of the year (*id.* at Line 6g).  But "total administrative expenses" covers more than recordkeeping—it can and does include things like legal fees, auditing fees, and investment advisory fees.  *See Matousek*, 51 F. 4th at 279.

WL 17584416 at *7 (noting that it was impossible to evaluate benchmarks without knowing their underlying calculation methodologies).  Plaintiff also mixes and matches the terms "compensation" and "recordkeeping fees" even though the two are very different.  As the Complaint readily admits, recordkeepers provide services that go beyond data management and transaction processing.  Compl. ¶ 81.  Comparing Prudential's "compensation" to other plans' "recordkeeping fees" is therefore unhelpful.  By lumping various types of fees together, Plaintiff makes it impossible to draw like-for-like comparisons.

Fourth, the Complaint fails to allege any facts plausibly suggesting that another recordkeeper would have provided the same services as Prudential for a materially lower cost. *See Divane v. Northwestern Univ.*, 953 F.3d 980, 984 (7th Cir. 2020), vacated on other grounds, *Hughes v. Northwestern Univ.*, 142 S. Ct. 737 (2022) ("Plaintiffs have identified no alternative recordkeeper that would have accepted such a low fee [and have] failed to explain how a hypothetical lower-cost recordkeeper would perform at the level necessary to serve the best interest of the plans' participants.").  Instead, it alleges "upon information and belief" that NCL failed to undertake an RFP during the class period.  Compl. ¶ 94.  Plaintiff has since learned, through the administrative process, that this is simply untrue—the Committee conducted an RFP in 2018, in which Prudential (who was not the incumbent recordkeeper at that time) submitted the bid with the most favorable pricing.  Decl. Ex. 30 at NCL0002826.  Even if this allegation were still credited with the presumption of truth, however, it would not state a claim.  *See Albert*, 47 F.4th at 579 (failure to solicit competitive bids does not state a prudence claim); *Riley*, 2022 WL 2208953 at *5 ("[T]he allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation.")

   2. The Complaint's Allegations Regarding "Inappropriate" Share Classes Fail To State A Prudence Claim.

The Complaint's failure to state a plausible claim that recordkeeping fees were excessive also dooms its other claim that NCL caused the Plan to invest in "inappropriate, high-cost" share classes.  In support of this claim, the Complaint presents a list of twelve of the Plan's options, including her SIA Target Date 2050, and compares them side by side with a different "share class" of the same fund.  For example, Plaintiff compares the Plan's Class 2 shares of the SIA Target Date 2050 trust, which carry an expense ratio of .60%, with Class 1 shares of the same trust, which carry an expense ratio of .45%.[10]  Compl. ¶ 75.

The Complaint is ultimately self-defeating, however, because it also explains the reason why retirement plan fiduciaries opt for the more expensive share class:  revenue sharing, as described in Paragraph 84:

> Recordkeeping expenses can either be paid directly from plan assets, or indirectly from by the plan's investments in a practice known as revenue sharing (or a combination of both).  Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

Plaintiff then concedes that revenue sharing "is not *per se* imprudent," and adds that she "is not making a claim against Defendants merely because they used revenue sharing to pay recordkeeping fees."  Compl. ¶ 85.

The concession is unnecessary.  Revenue sharing is a common feature of retirement plans, and courts already recognize that its use is not evidence of a lack of prudence.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 331 (8th Cir. 2014); *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th

---

[10]   Notably, the difference between the Class 1 and Class 2 expense ratios is .15% (or 15 basis points), which is the same as the aforementioned revenue sharing payment.  See Decl. Exs. 34-35 (showing that Class 2 pays a 15 basis point service fee to cover recordkeeping costs while Class 1 does not).

Cir. 2009).  Likewise, courts recognize that share class selection and revenue sharing are closely intertwined.  "As a general matter, expense ratios and revenue-sharing payments move in tandem:  the higher a given share class's expense ratio, the more the fund pays [the recordkeeper] in revenue sharing.  It is also the case that the more [the recordkeeper] receives in revenue sharing, the less it charges plan sponsors or participants directly for its services." *Leimkuehler v. American United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013).  Accordingly, a plan's inclusion of a more expensive class of funds does not evidence a deficient process.  *See Marks v. Trader Joe's Co.*, No. CV19-10942 PA (JEMx), 2020 WL 2504333, at *8 (C.D. Cal. Apr. 24, 2020) ("Merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach.").

If Plaintiff concedes that revenue sharing is not imprudent and not the basis for her claim, then what is her claim about?  The Complaint attempts to answer this question in two ways. First, it alleges that revenue sharing "can be devastating for Plan participants" if it is "left unchecked."  *See* Compl. ¶ 86; *see also id.* ¶ 87 ("revenue sharing payments…*can* provide excessive compensation") (emphasis added).  But there are no direct allegations that revenue sharing actually was left unchecked in this case, or that it actually led to the "devastating" consequences that the Complaint warns about.  As already shown, the Complaint fails to state a claim that recordkeeping fees were excessive.  Without such a claim, Plaintiff's allegations are an exercise in speculation that cannot state a claim.

Second, the Complaint alleges that revenue sharing leads to fairness concerns because some participants invest in revenue sharing funds while others do not.  *See* Compl. ¶ 100.  It further alleges that "the best practice is a flat price based on the number of participants in a plan." *Id.* ¶ 101.  As to what that price should be, it alleges that "a reasonable fee ought to be no

14

more than $25 per participant annually." *See id.* ¶ 102; *see also id.* ¶ 107 (alleging that a recordkeeping fee of between $21 and $33 per participant would be reasonable). These allegations do not necessarily depend on whether the Plan's fees were excessive, but they fail for a different reason: neither ERISA nor the Plan documents support a prudence claim based on the manner in which Plan expenses are allocated. The Plan provides that the Plan Administrator "may allocate all, none or any portion of the Plan's expenses to Participant Accounts. When allocating expenses among Participant Accounts, the Plan Administrator may allocate such expenses using any reasonable method that does not violate Title I of ERISA and does not discriminate in favor of Highly Compensated Employees within the meaning of applicable provisions of Code section 401(a)(4)." Decl. Ex. 9 § 7.4(d). Plaintiff does not allege that revenue sharing violates any of these provisions or that it discriminates in favor of highly compensated employees. Accordingly, her claim is without legal support. *See Riley*, *supra; see also Hughes*, 142 S. Ct. 737 at 742 ("[C]ourts must give due regard to the range of reasonable judgments that a fiduciary may make.").

In summary, the Complaint fails to state a plausible claim that NCL's selection of share classes was imprudent given its concessions about revenue sharing, its failure to plausibly allege that the Plan's overall recordkeeping fees were excessive, and the lack of any legal authority requiring a flat fee.

### 3. The Complaint Fails To State A Duty Of Loyalty Claim.

Plaintiff's claims are styled only as prudence claims, and the Complaint does not expressly allege a breach of ERISA's duty of loyalty. Nevertheless, because the Complaint gives passing mention to the duty of loyalty (*see, e.g.,* Compl. ¶¶ 4, 54-57), Defendants address the duty of loyalty out of an abundance of caution.

ERISA's duty of loyalty is separate from the duty of prudence, requiring fiduciaries to act "solely in the interest" of plan participants and beneficiaries and "for the exclusive purpose of providing benefits to participants" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). "The duty of loyalty prohibits [fiduciaries] from engaging in transactions that involve self-dealing or that otherwise involve or give rise to conflict between the fiduciary duties and personal interests." *Santiago v. Univ. of Miami*, 2021 WL 1173164, at *3 (S.D. Fla. Mar. 1, 2021). To state a disloyalty claim under ERISA, it is not enough for a plaintiff merely to repackage the allegations of imprudence as those of disloyalty; rather, "plaintiffs must allege a specific conflict and harm resulting from the conflict." *In re ING Groep*, 749 F.Supp.2d at 1351 (citing *In re McKesson HBOC, Inc.*, 391 F. Supp. 2d 812, 835 (N.D. Cal. 2005)); *see Santiago*, 2021 WL 1173164, at *3 (analyzing claims of imprudence separately from claims of disloyalty even though plaintiffs alleged both in single counts, recognizing that "these are separate claims with distinct elements"); *Smith v. CommonSpirit Health*, 2021 WL 4097052, at *12 (E.D. Ky. Sept. 8, 2021) ("It is well established that 'to state a loyalty-based claim under ERISA, a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts.'") (citations and punctuation omitted); *Guyes*, 2022 WL 18106384 at *6 ("[A]n ERISA plaintiff may not simply repackage a duty of prudence claim as a duty of loyalty claim.").

The allegations in the Complaint provide no basis for inferring that decisions regarding Plan service providers or fund selections were driven by self-interest or that the fiduciaries profited at the expense of the participants, and therefore cannot support a claim for breach of the duty of loyalty. *See Pledger v. Reliance Trust Co.*, 2019 WL 10886802, at **17-18 (N.D. Ga. Mar. 28, 2019) (recognizing that "[t]he duty of loyalty is separate from the duty of care and

16

prudence" and noting that the ERISA duty of loyalty requires the fiduciary not to place its own interests ahead of the plan beneficiaries'); *Santiago*, 2021 WL 1173164, at \*3 (dismissing duty of loyalty claims where plaintiffs failed to allege sufficient facts to show that the defendant "acted for the purpose of benefiting third parties or themselves").

    4.  <u>Plaintiff's Derivative "Failure to Monitor" Claim Must Also Be Dismissed.</u>

Finally, Count II of the Complaint, styled as a claim for "failure to monitor other fiduciaries and service providers," fails because there is no underlying claim of breach that can survive dismissal. *See Foster v. Adams & Assocs., Inc.*, 2020 WL 3639648, at \*2 (N.D. Cal. Jul. 6, 2020) (citing *Rinehart v. Lehman Bros. Hldgs. Inc.*, 817 F.3d 56, 68 (2d Cir. 2016)).[11]

**C.    The Complaint Fails To State A Claim Against NCL Corporation Ltd.**

Both Counts of the Complaint against NCL Corporation Ltd. are subject to dismissal because there are no plausible allegations that it was a Plan fiduciary. The Complaint tacitly acknowledges that NCL Corporation Ltd., unlike NCL, was not a named fiduciary. *Compare* Compl. ¶ 32(a) *with id.* ¶ 33. Therefore, it can only be a fiduciary if it acted as a "functional fiduciary" as defined by ERISA § 3(21), 29 U.S.C. § 1002(21)(A)*; see Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols. Inc.,* 658 F. App'x. 966, 970 (11th Cir. 2016). "[A] defendant is only a fiduciary to the extent that he exercises discretionary authority 'with respect to the particular activity at issue.'" *Carolinas Elec. Workers*, 658 F. App'x. at 969.

---

[11]  To the extent that Count II is premised on a failure to monitor Prudential, it is essentially duplicative of Count I. *Compare* Compl. ¶ 113 ("In addition, Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services") *with id.* ¶ 120(C) ("Failing to ensure that the monitored fiduciaries and service providers had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive….").

The Complaint alleges that NCL Corporation Ltd. "exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets and has discretionary authority discretionary responsibility in the administration of the Plan." Compl. ¶ 33. This simply parrots the statutory language, and is therefore insufficient on its own to satisfy *Twombly* and *Iqbal*. The Complaint contains no other specific reference to NCL Corporation Ltd. It does not even attempt to allege how NCL Corporation Ltd exercised discretionary authority or control over any aspect of Plan administration, let alone the specific activities at issue in this case. Moreover, the delegation of the relevant responsibilities to NCL forecloses any claim that NCL Corporation Ltd. had the power to control these Plan functions. Decl. Ex. 19.

### D.      Facts Plaintiff Learned In The Administrative Proceeding Further Demonstrate The Implausibility Of Her Claims

The aforementioned grounds are sufficient on their own to warrant dismissal of the entire Complaint. Further support for dismissal can be found in facts she learned through the now-completed administrative review of Plaintiff's claims. The Eleventh Circuit has repeatedly confirmed that plaintiffs in ERISA actions "must exhaust available administrative remedies before suing in federal court." *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328 (11th Cir. 2006) (quoting *Counts v. Am Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997)).[12] The rule requiring exhaustion serves a number of important purposes:

> Administrative claim-resolution procedures reduce the number of frivolous lawsuits under ERISA, minimize the cost of dispute resolution, enhance the plan trustees' ability to carry out their fiduciary duties expertly and efficiently by

---

[12]   Plaintiff's failure to exhaust her administrative remedies prior to filing suit would normally constitute an independent ground for dismissal. *See, e.g., Fleming v. Rollins, Inc.*, 2020 WL 7693147, at *5 (N.D. Ga. Nov. 23, 2020). Defendants do not ask for dismissal on that ground, due to the fact that the administrative proceeding has now concluded as to the claims asserted in the Complaint.

preventing premature judicial intervention in the decision-making process, and allow prior fully considered actions by pension plan trustees to assist courts if the dispute is eventually litigated.

*Mason v. Continental Grp., Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985).  Consistent with these policy goals, once a claim has completed the administrative review process (as is the case here), the Court may consider the administrative record, even on a Rule 12 motion.  *See Williamson v. Travelport, LP*, 953 F.3d 1278, 1289 (11th Cir. 2020); *Garland v. Snap-On Inc. Ret. Plan*, 2021 WL 1192991, at *4-5 (N.D. Ga. Mar. 8, 2021).

To be clear, the Court does not need to review the administrative record to grant the motion to dismiss.  Relevant portions of the administrative record show, however, that in addition to being insufficiently pled, the Complaint relied on allegations that are simply wrong.  For instance:

- Contrary to the allegation that Prudential was the Plan's recordkeeper "during the entirety of the Class Period" (Compl. ¶ 93), the record shows that Prudential has only served since 2019.  Decl. Exs. 12-17, 30;

- Contrary to the allegation that Defendants "have failed to undertake an RFP during the class period" (Compl. ¶ 94), the record shows that the Committee undertook an RFP in 2018 (and again in 2022).  This process included a side-by-side comparison of the bidders, their pricing, and the anticipated level of revenue sharing needed to pay administrative costs.  Decl. Ex. 30 at NCL0002826;

- Contrary to the allegation that "Defendants would have recognized that [Prudential's] compensation for recordkeeping services during the Class Period had been (and remains) unreasonable and excessive" (Compl. ¶ 94), the record shows that Prudential's bid had the most favorable pricing of the 2018 RFP bidders.  *Id.*

The administrative procedure further confirmed that Plaintiff has never been charged with a direct fee to recover recordkeeping costs.  Decl. Ex. 10; *see also* Decl. Exs. 31-33.  As noted in the Background, the most that Plaintiff possibly could have paid in revenue sharing was $2 -- far less than the $21 to $33 flat fee she alleges should have been imposed.  *See id.* and

19

*supra* p. 6. Based on the record, therefore, Plaintiff could not have standing to assert her flat fee theory even if she were able to support that allegation with further details. Plaintiff received documents establishing each of these facts since December 16, 2022 and has had ample opportunity to withdraw or amend her complaint, but has not done so. She cannot avail herself of the typical response that she lacks direct information about the Plan's fiduciary processes, or argue that discovery is needed to support her claims. "Discovery should follow the filing of a well-pleaded complaint. It is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim." *Kaylor v. Fields*, 661 F.2d 1177, 1184 (8th Cir. 1981); *accord Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 (11th Cir. 1997) ("Allowing a case to proceed through the pretrial processes with an invalid claim that increases the costs of the case does nothing but waste the resources of the litigants in the action before the court, delay resolution of disputes between other litigants, squander scarce judicial resources, and damage the integrity and the public's perception of the federal judicial system.").

## IV. CONCLUSION

For these reasons, the Court should dismiss the Complaint in its entirety with prejudice.

This 9th day of January, 2023.

/s/ W. Bard Brockman
W. Bard Brockman, Esq.
Florida Bar # 0868817
**BRYAN CAVE LEIGHTON PAISNER LLP**
200 S. Biscayne Boulevard, Suite 400
Miami, Florida 33131
Telephone: (786) 322-7500
Email: bard.brockman@bclplaw.com

Michael P. Carey, Esq.
Georgia Bar # 109364 *(pro hac vice pending)*
Ann Wrege Ferebee, Esq.
Georgia Bar # 431941 *(pro hac vice pending)*
**BRYAN CAVE LEIGHTON PAISNER LLP**

1201 W. Peachtree Street, NW
Atlanta, Georgia  30309
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email:  michael.carey@bclplaw.com
Email:  ann.ferebee@bclplaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

This certifies that on this 9th day of January, 2023, the foregoing DEFENDANTS'

MOTION TO DISMISS AND MEMORANDUM IN SUPPORT was served via statutory

electronic service on the following counsel of record:

> Amanda E. Heystek
> Luis A. Cabassa
> Brandon J. Hill
> WENZEL FENTON CABASSA PA
> 1110 N. Florida Avenue
> Suite 640
> Tampa, Florida  33602
> Email:  aheystek@wfclaw.com
> Email:  lcabassa@wfclaw.com
> Email:  bhill@wfclaw.com

> /s/ W. Bard Brockman
> W. Bard Brockman, Esq.
> Florida Bar #0868817
> **BRYAN CAVE LEIGHTON PAISNER LLP**
> 200 S. Biscayne Boulevard
> Suite 400
> Miami, Florida  33131
> Telephone: (786) 322-7500
> Email:  bard.brockman@bclplaw.com

22